Plaintiff's left eye was injured when struck by a flying piece of concrete that came from a piling of that composition which was being hammered by plaintiff with a sledge. Testimony relating to the size of the piece of concrete is meager. Plaintiff told his physician that it was about the size of his fist. The full force of the blow did not reach the eyeball. There were small lacerations in the eyebrow and below the lash, but there was no injury to the bony structure constituting the orbit.
The injury disabled plaintiff and he was paid compensation at the rate of Twenty ($20.00) Dollars per week to June 4, 1947, a period of seven weeks, two days after which date he was discharged by the eye specialist who had treated him, as being able to resume work. He refused to accept a check covering compensation due from June 4th to June 6th, 1947.
In this suit plaintiff, who is a Negro laborer, sues for compensation on the basis of permanent total disability to do manual labor. He alleged that his physical condition is the result of said accident. Specifically, he alleged total loss of the sight of eye and that:
"he suffered constant and continuous pain in his left eye and upon the slightest exertion and heat suffers pain in his right eye causing severe headaches and more excruciating pain * * *".
The employer, W.R. Aldrich Construction Company and its insurer, American Mutual Liability Insurance Company, were made defendants.
Defendants, while admitting the occurrence of the accident, deny that its effects produced the character of disability of which plaintiff complains. They allege that the inflammatory condition of the eye caused by the flying piece of concrete had entirely cleared up and all disability resulting therefrom had ceased when he was discharged by the attending physician as being able to resume his usual work; and that thereafter no compensation whatever was due him.
Plaintiffs demand was rejected and his suit dismissed. He appealed to this court.
The contest below mainly revolved around the question whether the vision of plaintiff's left eye is, for all practical purposes, lost. Four eye specialists testified in the case, two for each side, but they were not interrogated concerning the other pathology complained of by plaintiff, the origin of which he ascribes to the blow to the eye. Two of these doctors are positive in the opinion that sight of the eye is practically gone, while the other two are equally certain in the opposite opinion, and further, they stamp plaintiff as being a malingerer.
Plaintiff testified that he was knocked down from the force of the impact and was assisted to his feet by a brother who was working with him. The brother corroborated this statement. He also testified that his brother took him out to see the foreman who put "something" in his eye. The foreman did not testify. Two days *Page 676 
later he went to the office of Dr. Quantz in Alexandria, Louisiana, and was examined by him. He was directed to go to a hospital in that city, and did so, where he remained for one week. Examination of plaintiff's eyes by Dr. Quantz disclosed normal vision in each. He did not discover any foreign matter in either. There was some congestion in the left eye and inflammation of the conjunctiva, the mucous membrane lining the eyelids. The patient was observed by this physician twice daily while in the hospital. On April 16th, the day he was discharged from the hospital, plaintiff again reported to Dr. Quantz' office and his eye was again examined. It was then found that there was present acute uveitis, which means inflammation of the uveal body, the choroid, due to trauma. Drugs were administered to relieve the eye's condition and to prevent possible infection. Naturally, these conditions affected the eye's vision. Thereafter, until finally discharged on June 6th as being able to resume work, he was treated by and was under the observation of Dr. Quantz.
On June 7th, the day following his discharge, plaintiff returned to the doctor's office and complained of lack of ability to see out of the injured eye. He was given what is referred to as the "malingerer's test" because Dr. Quantz was unable to find any reason for the conditions of which plaintiff complained. The doctor at that time found both eyes to be practically normal. Plaintiff was on August 26th again examined by Dr. Quantz, at which time the eye's power of vision was again checked by appropriate tests and was found to be practically normal.
In order to have his diagnosis checked, Dr. Quantz sent plaintiff to Dr. Noel Simmonds for additional examination. Dr. Simmonds found nothing demonstrably wrong with the eye. It was then, in his opinion, in a normal condition with no evidence of the trauma, save small scars above and below it. Usual and approved tests were resorted to as a means to determine whether plaintiff was honest in his profession of loss of sight of this eye. From these tests Dr. Simmonds reached the firm conclusion that plaintiff was a malingerer. While giving his testimony in open court, Dr. Simmonds re-examined plaintiff's eye and found no change in its condition from that revealed by other examinations. He then, in open court, made what is called the "prism" test and from it his prior opinion of the eye's condition was confirmed. The trial judge observed the making of this test and evidently was convinced of the correctness of Dr. Simmonds' conclusions.
On behalf of plaintiff Drs. Gandy and Littell testified. At different times they also made tests in order to determine the true condition of plaintiff's injured eye and each reached the conclusion that beyond the ability to discern light, the eye's power of vision is gone. The record does not disclose the dates when these tests were made.
Therefore, numerically, there is set-off in the expert opinions as to the present condition of the injured eye. All these experts, so far as the record discloses, are of equal ability and credibility. No reason is assigned nor intimation ventured why they should not be fair and honest in giving their opinions in this case. On this basis, however, it is obvious that plaintiff has failed to prove his contention that the sight of the eye has been lost. But, a careful study of the testimony of all of these experts, together with due consideration of the various tests made by them, has led us to the conclusion that in probative weight the opinions of defendant's experts should prevail over those of the plaintiff. From this conclusion there follows the inevitable conclusion that plaintiff is not sincere as regards the condition of his eye.
As a corollary to the foregoing conclusion, plaintiff's profession of subjective symptoms must be materially discounted, if not rejected in toto. As said before, he offered no medical testimony as regards said subjective symptoms. Members of his family and one other witness corroborated what he said about these symptons but their testimony is mainly based upon his own statements and actions. The testimony of his wife, if standing alone, would impress the reader with the idea that plaintiff is practically helpless because of physical *Page 677 
impairments and loss of vision. She overlooks the fact that the vision of the right eye admittedly is normal and that plaintiff experiences no difficulty in going about afoot.
In passing, it is worthy of note that the piece of concrete did not inflict large or deep wounds to the fleshy structure about the eye. Had it been the size stated by plaintiff and had it felled him to the ground, as he says, undoubtedly there would have been much more serious evidence of the impact. We are bound to conclude that in this respect, as well as in other material respects, plaintiff has greatly magnified the true facts.
Surely there is no manifest error in the conclusions reached by the trial judge, and for this reason and others herein assigned, the judgment from which appealed is affirmed with costs.